Good morning. May it please the court. My name is John Williams. I am here on behalf of Justin Anderson. This morning I would like to focus on two claims in our brief. The first concerns whether Mr. Anderson received constitutionally effective assistance of counsel. Under Wiggins v. Smith, a capital defense attorney must conduct a thorough investigation into mitigating evidence or must have a reasonable basis for not doing so. Here, counsel didn't look into brain damage related to fetal alcohol exposure. That omission was unreasonable given what counsel knew at the time, especially in light of reports they had of the mother's drinking. Evidence of fetal alcohol exposure and brain damage related to it, which is uncontested in this proceeding, would have changed the sentencing profile considerably and would have added weighty mitigation. The second claim from the brief that I would like to discuss arises from the trial court's mid-deliberations jury instruction. Instead of telling the jury to weigh the single statutory aggravating circumstance the state had charged, the trial court told the jury to also weigh the circumstances of the offense, which is not a valid aggravating circumstance under state law. This instruction placed a thumb on death's side of the scales and created constitutional error under Brown v. Sanders. Now, I'd like to begin with the ineffective assistance of counsel claim and the performance portion of that claim. As in any ineffective assistance of counsel analysis, the court must eliminate hindsight and try to place itself in counsel's position at the time of the trial. So with that in mind, what did counsel know going into the resentencing in 2005? Remember that Mr. Anderson had been tried, the sentence had been reversed, and the attorneys had the opportunity to have a second bite at the apple. So they knew that Justin had obvious cognitive problems. They knew this for a couple of reasons. First of all, they had a basic inability to communicate with him. Latrice Gray at the habeas hearing testified that they had an inability to communicate with him throughout the first trial and the second trial. They had school records. They knew that as a 17-year-old, he was unable to get past the ninth grade. And most kids are graduating high school when they're 17. They knew that intellectual disability could not explain his cognitive limitations. And why did they know that? They knew that because they had a couple of different IQ tests that told them that his IQ, while low, was elevated and not sufficient to establish intellectual disability or mental retardation, as that condition was called at the time. They had their own expert, Dr. Monty Penny, who tested him with an 81 IQ. They had a state expert who had tested him with a 91 IQ. With this evidence, they had gone into the first trial and asked the judge to find him intellectually disabled. The judge said, he's not intellectually disabled. They had asked the jury to find him intellectually disabled. The jury said, he's not intellectually disabled. Yet when preparing for the resentencing, they focused exclusively on intellectual disability. And I think the most important piece of data they had was that Justin's mother was drinking around the time of pregnancy. Now, counsel, they didn't have direct evidence today that she was drinking during pregnancy, if I'm reading the record properly. The best evidence they have of the timing was in Appendix AA-1, and we've discussed that in our 28J letters. What that said, it's a note from the investigator. It's an interview with Susie Anderson, who's Justin's grandmother. And she said that when Jerry and Ruby got together, that's Justin's father and Justin's mother, that they were both drinking, and that was around the time that the boys... So this case is different from Williams and the Fourth Circuit, then. In that case, as I recall, there was evidence in the record of drinking during pregnancy. Is my recollection correct? There was evidence of about the same quality, I would suggest, as we have in this case. As far as the timing goes, was it the same? I cannot recall the precise timing, but the mother, they either didn't ask the mother, as was the case here, or she denied it. And they asked the father and, I believe, a sister, but they had sketchy details. And the details were not... They did not tell the attorneys, in my recollection, that I saw her drinking while she was three months pregnant. They said that she was drinking around the time. And that's what was the case here with this But that wasn't... Counsel, I want to get back to just sort of a, I don't know, just a logical question, which is, here you have, I think, the defense consulted between five and 10 experts. I realize that only two of them gave reports. There were mental health experts that both consulted with and filed reports. None of them suggested fetal alcohol syndrome or partial fetal alcohol syndrome. And I just wonder whether you're asking too much from attorneys to make a diagnosis that mental health experts have not. So in order to make the diagnosis, the mental health experts need sufficient information. And one key piece of information that any expert would take into account was that the mother drank while she was pregnant. And that's not the only evidence of drinking. There's drinking throughout his childhood. But the defense attorneys never told these experts that he was drinking. And that is a key signal to the expert that fetal alcohol is... But didn't he, he met with almost all the mental health experts. And he, I mean, presumably, I mean, he did suffer from, you know, low intellectual capacity, but presumably he was giving the same information to the mental health experts that he was giving to his own lawyers, wasn't he? He was discussing his history of abuse, primarily. I mean, let's face the single best fact for the state in the case. The best fact for the state in the case is that Dr. Speck Kern came to the prison a month before the resentencing and looked at him and said, he doesn't look obviously brain damaged to me. You know, I have some tests I could give for that. You may, may not want that. He doesn't look obviously brain damaged to me. But she didn't have the information about his mother's drinking. And counsel who controls the case didn't have her do the test that she would need to do to tell whether there would be fetal alcohol exposure, brain damage. Wasn't there significant evidence though of his cognitive problems? There was significant evidence of his cognitive problems. So what's the difference? How much difference does it make that it was a result of fetal alcohol syndrome? Well fetal alcohol syndrome is a, another way of saying brain damage, a specific form of brain damage. And the jury didn't hear about that. If the results of fetal alcohol syndrome are put before the jury in terms of his cognitive disabilities or problems, what difference does it make that there wasn't this label fetal alcohol syndrome attached to it? I'm not sure that it would matter if there wasn't this label, but I would dispute the premise. I don't think the evidence was put before the jury. That was my first question. My first question was, was all the cognitive disabilities put before the jury? No, it was not. I mean, the mitigating case here was about his abuse. It was about the abuse he suffered as a child from a stepfather, from his father, neglect. But there was no evidence of brain damage. Dr. Speck Kern, the mental health expert at the resentencing, said, I'm basically here to look at him as a young person to kind of explain, you know, who he is. But she said, I didn't do a forensic evaluation. I mean, a mental health expert who had indications that he may have, that his mother may have drank, would have done that sort of forensic evaluation, a 30-minute test, the Wisconsin card sorting test, which they discussed extensively with counsel in January 2005, February 2005. Now my understanding is, to follow up on Judge Grutter's question, is there were several things that the jury was explicitly told about during the mitigating case. For instance, his low IQ, you mentioned his struggles in school, that was presented, and evidence of to sort of Judge Grutter's question, if those specific things were put before the jury, how much of a difference would it have made to say fetal alcohol syndrome too? Because he presented, I think, what, 30 some mitigating factors or 40 mitigating factors? He presented 30 mitigating factors. Well, he presented 35. The jury found 30, which boiled down to essentially one factor. He was abused. The jury didn't find that he had an emotional disturbance at the time. I believe they didn't even find that his low IQ was mitigating. I mean, people with fetal alcohol spectrum disorder, they have regular IQs, or they can have average IQs. A 91 IQ is not inconsistent with this sort of brain damage. And so it sort of masks the problems that the person has because they appear to be normal on IQ testing instruments, yet they have significant brain damage that wasn't presented in this case. That's the difference. I think the attorneys presented the abuse. They presented he performed poorly in school. Okay. A lot of people do. He had a low IQ, not sufficiently low to be ID, but okay. He had depression. But going to brain damage takes it to a whole different level that offers some explanation for the offense and that also tells the jury about who this person is. And this is the sort of evidence that many courts, including the Supreme Court, have said is important to present in mitigation. I mean, that's Porter versus McCollum, Sears versus Upton. Could there have been a strategic reason here? One of the things that becomes clear from the record is that the defense counsel made certain strategic decisions because the team was worried about disclosure under the Arkansas rules, that you'd have to disclose some of this to the prosecution. And in fact, some tests had been done that they had to turn over at some point or didn't write reports about because of the risk of having to turn it over. So could there have been a strategic reason for why, even though it may have looked bad in hindsight, not right in hindsight, could there have been a strategic reason here for this decision? I disagree that there was a strategic reason. And I think this is a mistake in the district court's opinion. Wiggins tells us not to create a post hoc rationalization that is not supported by the record. So Latrice Gray didn't testify that she had a strategic reason for non-disclosure because she was afraid of bad evidence. And if we examine that a little bit, there's not really any harm that would have been done from a test. So they had no evidence. They had no intellectual disability evidence. They had depression. But testing him and then finding no brain damage would not have harmed the case. And in fact, the prosecutor was able to get up in closing arguments and say, there's nothing wrong with him. They presented Dr. Speckhorn, who said, he smiles and it's like a mask and I don't know how to help him or something along those lines. So they presented plenty of negative evidence and simply getting a test that showed nothing would not have hurt. I mean, the court cited Forrest v. Steele as an analogous case. But I would distinguish that case because in Forrest v. Steele, they at least had some evidence of brain damage, of inability to function mentally. And here, there was simply nothing. And so it's not supported by the logic of the case. It's not supported by Latrice Gray's testimony. And I'd say that this is really an investigative failure. Again, in February and January of 2005, Dr. Caperton and Dr. Speckhorn were saying, he's not ID, but he may have some brain damage. We've got these neuropsychological tests. And they didn't do the investigation. So before formulating any strategy, and this again, comes from Wiggins, you have to do an adequate investigation. And I would submit that this was not an adequate investigation into a very important component of the case. If there are no further questions about performance... Before you move on, I'm just, I'm trying to figure out exactly what the nature of the claim is here. Because you're saying, and it gets back to the question I asked about, about the expert and what the experts knew. On one hand, you're saying there wasn't an adequate investigation. And I think that's your primary claim. But you're also saying that the council should have let the experts know that the mother was drinking. And so are you alleging that they knew it and didn't tell the experts? Or are you alleging that they didn't know it and should have investigated it? Which are two very different claims. I'm alleging that they knew it and didn't tell the expert, or at least they had enough information to investigate further. Here's what happened. We go back to the memo at AA1 and other evidence of her drinking. They didn't go and ask mom whether she drank. That's something they should have done. But they had enough information to get there. And they should have gotten there. And then they should have informed the experts. So I guess there is an element of both. Yes. Prejudice. We have to show prejudice, of course. And I've discussed a little bit about the importance of brain damage. And I think that goes to prejudice. As I've mentioned, courts, including the Supreme Court, have recognized the importance of this evidence in a mitigation profile. And Williams v. Sterling is one. I think Littlejohn v. Trammell in the Tenth Circuit cited in our brief is another. This court, although it wasn't the specific form of brain damage in Antwine v. Dello, also found prejudice from the failure to do a reasonable investigation into mitigating health evidence. And so having not done the investigation, the jury didn't hear about this evidence. And it was prejudicial. I know you can't count numbers when you're talking about aggravating versus mitigating. But we've established the jury found 30 that there were nearly 40 presented. As I recall, there was one aggravating factor, although we're going to get to your argument about the fact there might have been this sort of catch-all factor as well. With 30 found, many argued. Would have adding one or two or three more made a difference as a matter of prejudice analysis? It depends on what it is. And in this case, it would have been a very significant case of brain damage. If you look at the mitigators, look at the jury form and see what they are. So at Appendix T4, one of them says Amos, his stepfather, physically abused Justin. Then the next one says Amos was convicted for abusing Justin. And that really adds nothing. I mean, this is why we don't care about the quantum of the evidence in a prejudice analysis. It's why we care about the quality. Didn't at least some of them go to intellectual ability and cognitive brain type issues? There was only the issue of IQ. I believe they presented IQ. And again, someone can have a normal IQ and be brain damaged because their mother drank when they were pregnant. So I do want to go ahead and talk about this aggravating factor argument. And that arises under Brown versus Sanders. So the state court at first properly instructed the jury about what they were supposed to do. They're supposed to weigh the single aggravating factor, the prior violent felony, against the mitigating evidence that they found. But then the jury came back with a question. And they asked, what do we weigh? And it's clear at this point of the analysis that they are on weight. They asked, do we weigh the Clara Creech circumstances? Do we weigh the Roger Salvey circumstances, the prior violent felony? Or do we weigh them both? And then the judge, the trial judge, made an error. He said, you are to consider all the evidence and give it whatever weight you find appropriate when weighing the evidence. And that was unvalid because the state did not charge an omnibus aggravator, allowing consideration of the circumstances of the offense. And in fact, state law does not contain an omnibus aggravator that would allow the court, the state, to charge the circumstances of the offense to be weighed. What about section 5-46024D? Does that regard victim impact? Well, that's 4A. So both of them actually are relevant. But 4D says that the jury can consider any evidence admitted at the trial relevant to punishment may be considered by the jury without the necessity to reintroduce the evidence at the sentencing proceedings. That gets at the consideration of evidence. And I'm drawing a distinction between consideration of evidence and deciding, for example, whether a mitigating factor exists, whether an aggravating factor exists. You don't have to reintroduce evidence that was heard earlier to get into that consideration. Doesn't that imply that they can consider the facts of the offense in weighing? They cannot weigh the facts of the offense. And Arkansas state law has been clear that that statute did not create another aggravating factor. Arkansas has decided to limit its aggravating factors to 10 very narrow factors. And that does not mean that because of the new statute that you can, as a jury, weigh all that evidence. It can come into the deliberations. It can come into the proceeding. But when it gets to weighing, when it gets to the question of do you weigh the aggravators against the mitigators, that particular section does not allow weighing. Even if that's true, though, what transforms this into a constitutional claim? Brown v. Sanders. And that's where we come to the Brown v. Sanders part. So the first part we establish is that there is an invalid aggravator. And that's what the instruction did, create an invalid aggravator that was weighed. And then you do the Brown v. Sanders analysis. So there used to be a heavier reliance on this distinction between weighing and non-weighing states. And Brown v. Sanders said, well, whatever kind of state it is, if the jury has weighed an invalid aggravator, it's only a constitutional error if the jury could not have considered the same evidence under a valid aggravating factor. But didn't Brown invalidate, the factors in Brown were invalidated on constitutional grounds themselves, weren't they? Could you invalidate factors in the Brown case invalidated on constitutional grounds? You're arguing here that there was a sentencing error based on Arkansas statutes. My understanding or recollection of Brown is those were constitutional issues that forced the factors to be invalidated. I may be misreading the case, but... Well, it goes to the question of whether the factor was invalid. I don't think it matters why the factor was invalid. And I think I conceded too much in my reply brief, honestly, on Brown, which I look back at Brown, at least one of the invalid factors was invalid under California merger law, that's state law. So it doesn't really matter why the factor is invalid. It goes to the question of whether the jury weighed as aggravation evidence that should not have been considered aggravating under the state scheme. But you concede a violation of state law won't necessarily get you there on a weighing. Doesn't it have to be an unconstitutional aggravator? No, it does not. I mean, I think it has to be an invalid aggravator. That's what Brown says. And I don't think, again, Brown says, does not say that it has to be invalid because it's unconstitutionally vague. Well, does Brown say it's invalid because of state law? Brown just says there were invalid aggravating circumstances in this case. Were they based on state law? One of them was. Which one? The one about burglary. It had to do with state merger law. And again, I didn't put, I didn't, I honestly did not look at Brown closely enough when looking at my reply brief. But if you look closely at Brown, you'll see that one of them was under state law. But that is really, the reason that it was invalidated is not important. The question is whether the jury weighed evidence in aggravation that for whatever reason should not have been weighed in favor of death. And then the question becomes whether they could have considered the same, weighed the same evidence under a valid aggravating factor in the case. And in this case, there was only one aggravating factor. See, I can, I can, can see where consideration of race would be unconstitutional and that would never be allowed. But consideration of the underlying facts of the very crime at issue doesn't strike me as something that violates the constitution at a minimum. And I just wonder if state law alone is enough to get you there. Well, it, it does under the analysis in Brown, because it skews the death consideration under the system that state law has chosen. It's unconstitutional skewing. Skewing is the term that Brown says. And this, this goes back to a long line of cases that starts with Zan v. Stevens. It goes on through Clemens v. Mississippi, Stringer v. Black. Counsel, states have some latitude within constitutional bounds of setting up how they're going to handle sentencing cases and capital cases. And you're suggesting once they do that, that transforms a violation of the state statutory structure into a constitutional issue? Or am I misstating your position? Well, I certainly agree that states have constitutional latitude to establish a system under the Eighth Amendment within a broad range. But once the state has determined that there is to be limited aggravating factors, the consideration of factors outside of that range skews the death consideration. Someone who was in Mr. Anderson's position, who had one aggravating factor and who had not received this sort of instruction, would have had a very, a much more narrow consideration, much more narrow weighing in terms of death. But by allowing all this additional evidence to come in as weighing in aggravation, Mr. Anderson was placed on unequal footing. Counsel, I want to ask an antecedent question to all of this, which is, I've reviewed the state court briefs and I realized that an administrative panel of this court expanded the certificate of appealability on this issue, but I can't find a single reference in the state briefs to this particular theory. There's a lot in there about victim impact evidence and the timing, but nothing about this instructional error in the improper way. And so I guess the question then becomes, isn't it procedurally defaulted? Thank you for asking that. That's important. I believe it is adequately stated in the brief, the, in both briefs really, but so I'll quote from the brief. Sure. At appendix U9, that's the opening brief, the heading to the argument, states an alternative argument, and it says that the court erred by instructing the jury to consider all evidence presented as aggravating circumstances to be weighed against the mitigators. That's the argument we're stating. And then toward the end of the brief, appendix U30, it argued that weighing of an invalid aggravating circumstance violates the eighth amendment that's cited cases like Stringer. But is there any, is there any substantive argument? Actually, I take that back. That was the one reference that I saw was the heading, but I didn't see any substantive argument. I didn't see the citation of cases. I didn't see, I mean, it really just is sort of like an afterthought in the brief. Yeah, we're going to state it, but we're not going to argue it, which I don't know if that's enough under to preserve it. I think there were two to three pages in the brief where they cite Clemens, they cite Stringer, and then in the reply brief, they actually discuss Brown, which is the case that this claim arises under. So I think it's adequate in terms of victim impact. It's a case I should have cited in my brief, Anderson versus Bruce. It's 106F3242. That says that the claims must be closely related and have arguable factual commonality. And I think that is the case here. There's sufficient information for the court to have ruled on. Well, I just want to make sure that the state were, I guess my concern is if I were the state court, I'm not sure, sure I would treat this as a separate claim. And I'm not so sure that I would have known that I needed to decide that particular claim because of course they didn't decide the claim you're now alleging. They didn't decide the claim, but I believe there was adequate notice because of all the citations of Eighth Circuit precedent, or excuse me, Eighth Amendment precedent. I'll reserve my time. Well, good morning. May it please the court on behalf of the appellee, Wendy Kelly. My name is Jake Jones and I'm with the Arkansas Attorney General's office. This court should affirm Judge Marshall's decision because he correctly concluded that Mr. Anderson's four claims were procedurally defaulted and without merit. Counsel was not ineffective for failing to investigate partial fetal alcohol syndrome, PTSD, and youth brain, nor was counsel ineffective for introducing a report stating that Anderson was on death row. The jury's consideration of the circumstance of the murder for sentencing purposes were not unconstitutional. And then finally, the tools were available at the time of Anderson's appeal in 2006 to argue that he was exempt from the death penalty because of his youth and mental deficiencies. With regard to his claims of ineffective assistance of counsel for failing to investigate partial fetal alcohol syndrome, PTSD, youth brain, counsel's performance on those issues was, it was not deficient. There was no deficient performance. So Strickland says that the federal constitution imposes one general requirement concerning counsel's performance, and that's if they make objectively reasonable choices. Counsel has a duty to make a reasonable investigation and or make a reasonable decision that makes a particular investigation unnecessary. Counsel, I want to just cut to the heart of the issue. You know, opposing counsel makes the argument in the brief that everybody knew that there were problems here, that he had some mental and cognitive difficulties. But I think the argument is they never tracked it down. They never figured out why that was, which could have led to the presentation of additional mitigating evidence to show that there was a reason why he might not have had the capacity that he should have. And so wasn't that a failure, objectively unreasonable to know that there were problems, but then not to investigate why those problems existed? Well, so with regard to counsel's investigation, what we have, they did extensive investigation. They had their team involved, a mitigation specialist, investigators. And so they went out into the community. They talked with all of Anderson's family members. They got his school records. They got his juvenile records. You know, they talked with Anderson himself, his brother. And so they did this extensive investigation, and it included some evidence that Ruby drank. But there isn't anything that required counsel to ask about, you know, specifically about partial fetal alcohol syndrome or PTSD. And I think the 2003 ABA guidelines, because we need to look at, like, what was the standard at the time that counsel was trying this case? And so the 2003 ABA guidelines themselves, they don't contain any mention of, you know, the guidelines themselves don't contain any mention of PTSD or FASD. And they specifically recognize that counsel's not expected to be able to detect conditions like PTSD and FASD. Instead, it suggested simply that counsel retain, and I'm quoting from the guidelines here, a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate. So that was what counsel was required to do, and they did that here. They took this extensive investigation, and it did, their investigation included the evidence from, you know, Dr. Speck-Kern. They gave it, and they did. They had him seen by five different experts, and they, you know, when they talked with Dr. Caperton, she said, well, there's no intellectual disability here, so she said you might look at some neuropsychological testing. And so they turned to Dr. Speck-Kern for this, and they gave her all of, if you look at the engagement letter with her, they gave her all of the, and Judge Marshall found it in his opinion, too. She had, and she testified, I had lots of records, lots of evidence, and that included evidence from the first trial testimony. And in that first trial, there were witnesses that said, you know, I think that they said Ruby drank. She was a drinker. Not that, never any specific evidence that she drank while she was pregnant, but their expert had that information. And Dr. Speck-Kern testified. She said they told me about that they were having trouble communicating with him, and they just wanted to know they were still looking for any kind of mental defects. And Dr. Speck-Kern said, I went to the prison with a couple of tests, neuropsych tests in hand, and I was prepared to give them to him. But she said after talking with him for a while, she said I didn't detect any evidence of major brain damage or frontal lobe damage. She's like, his problems just seem emotional. And that's what she went back and told, told counsel. Didn't she at some point, though, recommend that he be given this Wisconsin card sorting test for neuropsych problems? She said with regard to that, she said, after she, this is after she interviewed Anderson, and I think this, this really goes into what counsel's decision to pivot away from that. And she says, I could, she said, I don't see any, any evidence of this. And she said, I could give these things to rule it out. But she said, it's not based on anything that I think is there. But she said, it would just only be to rule it out. And she said, and she warned him, she said, but she said, that might get into what, more than what you want presented. And counsel, they were very aware of, and I think you see it in their emails, they were being cagey about what they might have to present to, you know, might have to turn over to the state. And so when she said, I don't think it's there, but we could do tests and just, they, they had pivoted away from that. And so that wasn't based on what their expert told them. That was an objectively reasonable decision. And the counsel's not required to track down, you know, the Sixth Amendment doesn't require counsel to track down every possible and rule out every possible mitigating defense, just that they make a reasonable investigation or that they decide that further investigation is not necessary after talking with their expert. Let me ask, the district court's reliance on Rule 18.2 and the potential disclosure of the reports, wasn't that a little misplaced? Didn't the trial court here say that it was only going to require reports to be turned over of actual testifying experts? Yes, but Dr. Speck-Kern, how that played into counsel, what counsel was thinking about it, Dr. Speck-Kern, she was, you know, counsel isn't required to go into, you know, have an, have an expert and then have them do testing and maybe have to dump that expert, you know, because the expert didn't give them what they wanted. You know, they, counsel told them, or the expert, their expert told them that, you know, I don't, I don't see anything here, but there was, it was, I think in the first, in the first trial, they had had them turn over, you know, any sort of, any experts that might testify and they anticipated Dr. Speck-Kern testifying. Well, and I was confused a little bit, just to follow up on the Arkansas, the way Arkansas practice works on this, because as I recall, Judge Grutter's exactly right about the nature of the order, but I think at the end of that order, the trial court also said that, that it was being left open for modification. So there was a possibility that more could be disclosed. Do trial courts generally, and particularly in death cases, do they require the disclosure of all documents or only for testifying witnesses? I'm not familiar enough to say whether they do, but they, they, they'd seen these experts and they didn't, they weren't going to have her do a test that she believed was unnecessary or that would, you know, simply rule out something she didn't believe was there because they didn't, she was going to testify for them. She was, she was their expert and, you know, that's their decision to make and they didn't want to have to possibly dump her as an expert if, if the test did come back and something they didn't want to use. So counsel's performance here, it, it wasn't deficient. There were no signs that Anderson's mother drank alcohol while she was pregnant. And this is all distinguishable from the Williams case where there were, you know, witnesses that said, oh yeah, mom drank while she was pregnant. And also you had the experts saying there's brain damage here and maybe we'd like to look into the circumference of the, you know, you know, get hospital records and counsel just ignoring that. We don't have any of that here. And they gave all the, and, and the evidence that counsel had, they gave to their expert and their expert didn't recommend, you know, she's a trained neuropsychologist and she could have presumably, you know, screened for, you know, just like their neuropsychologist at the, that the evidentiary hearing and district court did, screened for FASD, screened for PTSD, but she didn't, she didn't, based on her conversation with them, she didn't see that. So they reasonably relied on Spec Kern's advice and were not effective doing so. With regard to prejudice, you know, the question is whether or not, you know, if counsel wasn't effective, whether or not that undermines confidence in the outcome of the proceeding. Whether there's a reasonable probability that had the jury had the evidence put on at the evidentiary hearing that, you know, the outcome of the case would have been different. But here we have Dr. Spec Kern, what the evidence that she put on at the, and we kind of glossed over this, I heard that, you know, she only talked about his, his bad childhood, but that wasn't, she coupled his bad youth brain, but she talked about how she took all the evidence of his bad childhood. And then she said, also at the time, she said his frontal lobe was underdeveloped because of his youth. Like everyone until you're 25, the judgment portion of your brain is not formed. And, and she said that coupled with his bad childhood, it left him acting impulsively when he committed the murder. He acted impulsively and he was, you know, acted unthinkingly. And that's how she connected up and that's how she explained it. And then she went on to say, but now that he's in prison, he's, all of his needs are being met. She literally invoked Maslow's hierarchy of needs. And she said, he's, he's doing fine now. And then counsel parlayed that in their closing argument to say, he deserves mercy. He made a really bad choice and he deserves, he deserves mercy. He's not the kind of person that we put to death. He's salvageable. He's not going to commit any more crimes in prison. He's, you know, the same conditions that exist in time of murder don't exist now. And that's what, that was their theory of the case was mercy they asked. And they had, you know, Justin Anderson testify about it, you know, that he was remorseful. They showed us humanity. And counsel wasn't required, the evidence of PTSD and FASD would have cut that, it would have cut against that theory of the case because with the youth brain, you know, once he turns 25, his, you know, he can make good judgments. But if you put on evidence of PTSD and FASD, he's permanently damaged. Those things don't go away. And if you say, well, he has this permanent brain damage that, you know, is linked with him committing this crime, it may have left the, that would have, that would have cut against there. He's worthy of mercy. It would have maybe led the jury to think, you know, we can't, we can't trust that he's not going to kill again. But counsel, and I'm taking you back a little bit off the prejudice prong here, but isn't the standard in Wiggins that counsel may be able to make those decisions, but she needs to be aware before she makes those decisions of what the facts are. And that's why the investigation into fetal alcohol syndrome is so important because I think the first circuit is observed, you know, it goes to cause. And it's in that sense, brain damage is unique, or it's different at least from some of the arguments that counsel presented. And it sounds like she wasn't aware that she had the option going in. So she may have chosen a reasonable, you know, story of the case, theory of the case, but she wasn't aware of the brain damage that was out there that she could have then made that judgment. Yes. Well, she was, she was, again, she wasn't required to be able to screen for, you know, fetal alcohol syndrome. And so she took all the evidence that she had and they'd done in their extensive investigation, gave it to their expert and their expert didn't see any, any evidence of brain damage. And, and comparing, you know, now it's a, it's a federal evidentiary hearing, you know, what they're saying should have been presented to the jury and would have is evidence of partial fetal alcohol syndrome. And at the evidentiary hearing, the expert on fetal alcohol syndrome was asked, but, you know, this wouldn't, this isn't something that would have risen to the level of mental disease or defect or an affirmative defense. So how did, how did this, how would this have been presented? And he's, and, and the ex, the fetal alcohol expert said, well, yeah, sure, it wouldn't have excused the crime, but it would have shown how his, his thinking was influenced at the time that he committed the crime. And that's really no more than Dr. Speck-Kerns saying because of his youth brain, he, it caused him to act impulsively. So there's no, on that evidence, the evidence that, you know, it would have been one more mitigator and not, not an excuse for the crime. And so, again, with regard to, and, you know, it's the same, and it's the same with PTSD, the expert in the habeas evidentiary hearing said, you know, she used the word and said it, it left him at it. He acted, he would have acted impulsively if he'd had, if he had PTSD and that a lack of empathy. And Dr. Speck-Kern testified that all those things, that he suffered from all those things as well to the jury. And with regard to youth brain, again, counsel did put on evidence. That's, that was the, sort of the centerpiece of Dr. Speck-Kerns testimony is his underdeveloped frontal lobe. So no deficient performance and no prejudice. Getting into, getting into point two, he argues that his counsel is ineffective for allowing the jury to see a version of Dr. Speck-Kerns report that contained a single sentence containing that he'd been on death row since January of 2001. And he claims that this sentence somehow lessened the jury's responsibility and that they would have shirked their duty as, you know, in determining a sentence and just relied on what that previous jury had done. But from that single sentence, it's impossible to determine what the jury might have inferred from that statement. It didn't, the evidence didn't pertain to the jury's role in sentencing. They weren't affirmatively misled or told about that particular sentence like the Romano v. Oklahoma. I think that case is instructive here. And, and as Anderson points out, it's not a Sixth Amendment case, but the analysis in the Romano case is they take, you know, mere evidence that he, you know, the defendant had previously been sentenced to death. And they say, and so where it's instructive here is that it, they said that that didn't undermine confidence in the outcome of the trial. And so here, you know, that mere sentence, as in Romano, it didn't undermine evidence in the outcome of the trial. And that's the test. That's, yeah, it has to show for an effectiveness. And we see that the jury didn't just, in that instance, the jury didn't just rotely rely on what a previous jury might or might have done. They were in there, they were weighing the, they were doing what they were supposed to do as jurors, what they'd been instructed to do. They were looking at finding aggravator. They found that aggravator. They looked at the mitigators and found, you know, 30 mitigators. And then they weighed the, you know, made an individual determination on Anderson's sentence based on all of that. And so they didn't just rely on, I think, I think that's where you can see what the jury, how the jury revived a sentence and not just rotely doing what they, a jury, previous jury may have done. You know, on that point, counsel, you may be conceding too much because you have that isolated reference that says he's being housed on death row. But, and, you know, some, some folks might know that that means he's already been tried and convicted. Some folks may not know that. Some may think that, hey, he's being kept on death row because that's what they do with people who are up for capital murder awaiting trial. Yeah. And so, and so when I say it's impossible to know what they determined from that, that, you know, that's my first line of argument there. And certainly you can't go as far as saying, well, that, that caused them to, you know, shirk their duty as jurors. So that brings us to our third point. He argued the jury wrong, was wrongfully allowed to consider victim impact evidence as aggravation, but, and that's what he argued at in his opening brief. And then, and that's what the Arkansas Supreme Court determined. And that is a different argument than whether the circumstances of the offense were considered by the jury as a non-statutory aggravator. That was, that argument was never presented to the court. And to the extent that he might have, you know, gotten close to it in his reply brief, you can't raise arguments for the first time in a reply brief. So, and that's why the Arkansas Supreme, you know, to the extent that it, so it's procedurally defaulted. And to the extent that you can merge those two claims, the victim, victim impact evidence is the same thing as considering the circumstances of the crime, then that decision is entitled to, it's entitled to, the Arkansas Supreme Court's own adjudication of that is entitled to deference. And you don't think that the, the heading and, and so I guess you'd say the reply brief wasn't good enough, but the heading and some of the other references he made, that's not good enough to put on notice. No, because they focused on victim impact. The victim impact was, was considered as a, you know, a non-statutory aggravator. And that's what the Arkansas Supreme Court focused on. They had, you know, eight different ways of looking at victim impact evidence in their, or six or eight ways, I forget, in their opinion. So then they didn't consider, you know, whether the circumstances of the, you know, the crime were a non-statutory aggravator. But to the extent that they, that you can merge those two arguments, the Arkansas Supreme and the Arkansas Supreme Court did adjudicate the victim impact portion of it, then that's entitled to ad pedeference. And a state court, a state court's interpretation of state law binds a court sitting in habeas corpus. And the Arkansas Supreme Court's decision was not contrary to or an unreasonable application of, you know, any established Supreme Court precedent. And he talks about, he talks about Brown v. Sanders. But there's also a case, Barclay, that's cited. And it's a U.S. Supreme Court case. And in Barclay, you know, they considered the, there was a Florida court that considered his, they had a, you know, statutory aggravator, but they considered the state, they considered his criminal record in determining. And that was a non-statutory aggravator. And ultimately the court in Barclay said, that's, if that's an error, it's a, it's an error of state court law and mere errors of state court law don't concern us here. And so whether we're a weighing state or whether this jury instruction inadvertently turned us into a non-weighing state in this instance, neither one of those, I mean, there can be weighing states and there can be non-weighing states. They're not unconstitutional. And his consideration, the jury's consideration of, there's nothing unconstitutional about the jury's consideration of the circumstances of the crime for when that's what they're there to decide. What's his sentence in determining a sentence. So there wasn't anything unconstitutional about if the jury, if, if they did consider that as an aggravator, because there was nowhere, there was nowhere else in the forum for him to consider it. And the statute allowed it, as you pointed out, Judge Grunder, that it said, you know, aggravators, mitigators, and all matters relevant to punishment. And so it wasn't wrong for them to consider the circumstances of the crime. It wasn't, and it certainly wasn't, it wasn't wrong in Arkansas state law and it certainly wasn't wrong in the United States constitution. And then his final point is that he should be categorically exempt from the death penalty because of his age and because of his alleged mental deficiencies. And again, this is procedurally defaulted. He never raised it, but he says that, well, those claims, those arguments are so novel that that should excuse their procedural default. But the test that this court has set out is, were the tools available to his counsel at the time to make those arguments that he was categorically exempt from the death penalty because of his age? And they were. Those tools at the time of his state appeal in 2006, those tools existed. You had cases of, first you had Thompson v. Oklahoma in 19, going back as far as 1988. And in Thompson, the Supreme Court exempted teenagers under the age of 16 from the death penalty. And then in 2005, you had Roper v. Simmons, where they extended that anyone under 18. And in the Roper decision, the court said, the qualities that distinguish juveniles from adults do not disappear when an individual turns 18. And so they could have made that argument. It doesn't disappear when you turn 19 either at the time of his state appeal in 2006. And then with regard to his mental illness, those same types of, those tools to construct those arguments exist at the time. You had Ford v. Wainwright in 1986, where it said the Supreme Court announced you can't be put to death if you're insane. And then in 2002, you had Atkins v. Virginia, where they extended it to the intellectually disabled. And so the tools existed to say, well, let's, you know, to argue at least to go one step further. But in conclusion, as the district court found, Anderson's claims are procedurally defaulted meritless. And the respondent would respectfully request that the district court's decision be adopted. Mr. Jones? Mr. Williams, you have some rebuttal time, I believe. Thank you. Just to respond briefly to a few of the points that Mr. Jones made. First of all, he mentioned the guidelines and what was professionally reasonable at that time. And I have to correct him. The fetal alcohol exposure was mentioned in the ABA guidelines in 2003. It may not have said FASD, but there was reference to investigating maternal drinking. Not only that, but FASD was mentioned in ROMPIA, which was decided in 2005, same year as this trial. And in Arkansas, attorneys had been looking at fetal alcohol exposure as early as 1995. That's Miller, which is cited in our brief. Dr. Speck-Kern, again, I mentioned this in the opening, but, you know, all this information that you said about, I don't think he's brain damaged, that was given in July 2005, the month before trial, which was the first time that the attorneys actually said, why don't you go talk to him? You know, she was telling him in January, February, before the expert disclosure deadline, that testing is warranted. And they didn't do it had they adequately formed a strategy and done the investigation that could have formed a strategy that would have kept out any harmful information. Although, again, I would dispute that just doing a test like this would not have been harmful, even if it returned positive information, because they didn't have any negative information to undercut. The question of prejudice, it doesn't simply go to effects on the crime, although that is very important, but it also goes to his moral culpability, because it tells the jury about who he is. And he was 19 at the time of the offense, but the FASD made him more like a younger child. And that reduces his moral culpability. I mean, there's no categorical exception for people with FASD, but these people are like the sort of juveniles that aren't executed. Going to the Brown versus Sanders argument, Mr. Jones mentioned Barclay, and this goes to the state law question Judge Grunder had. I think that's important. I'd like an opportunity to So the Supreme Court talked about Barclay and Stringer versus Black, and this is a quote from page 231 of that opinion, characterizing what the Supreme Court did in Barclay. It said, in Barclay, the sentencing judge relied on an aggravating factor that was not a legitimate one under state law. We affirm the sentence, but only because it was clear that the Florida Supreme Court had determined that the sentence would have been the same had the sentencing judge given no weight to the invalid factor. Now, that was done under the former analysis that was done for weighing states, that the Supreme Court of the state would reweigh the evidence and determine whether there was error there. Now that's out the window. You do a Brown analysis, and the question is, could the jury have weighed the evidence that supported the invalid aggravating circumstance under some other valid aggravating circumstance? Here, there was only one aggravating circumstance, the prior violent felony. It didn't relate to the circumstances of the offense. Two final points. In terms of Brown and the reply brief, Brown was actually decided after the opening brief. The opening brief was filed in 2005. Brown was decided in early 2006. Then in the reply brief, appellate counsel discussed Brown. Besides that, there was also the citation to the Eighth Amendment cases that I mentioned earlier. And for edpedeference, if edpedeference applies, and I would disagree that it does, but if it does, I believe this is a contrary to case. The rule of Brown is clear. It's clearly applicable. It's not like an effective assistance of counsel claim where you have a wide range of reasonable performance. There is a simple rule, and if the jury could not have weighed this aggravating evidence under a valid aggravating factor, and they couldn't have here, then there's constitutional error that So if there are no further questions, I would request that the court reverse the district court and grant the writ to Mr. Anderson on resentencing. Very well. Thank you, Mr. Williams. Thank you. Court appreciates both counsel's appearance today, as well as your briefing. Case will be submitted and will be decided in due course.